John P. Cohalan, Jr., J.
This action was instituted pursuant to section 500 et seq. of article 15 of the Real Property Law. The third amended complaint (hereafter called complaint) seeks to remove an alleged cloud on plaintiff’s title which consists of a recorded declaration executed by a predecessor in title, among the terms of which is a clause that no dwelling may be constructed on the subject premises on a plot of less than five acres.
The affected parcel is 73 acres in size, of which plaintiff purchased 30. It is located at West Hills, in the Town of Huntington, Suffolk County, New York, and is bounded on the north by Map of Audubon Farms, on the east by Sweet Hollow, on the south by Chichester and on the west by Hartman Hills Road.
For the sake of clarity a full factual background will be developed.
In 1934, the Town of Huntington adopted a zoning ordinance. All of the property included in the within action was placed in “ A ” residence zone, permitting only one-family dwellings to be erected on plots of not less than two acres.
*1006 In 1938 owners of numerous parcels, both to the south and the southwest and inclusive of the subject acreage, executed and recorded an agreement limiting construction in their respective premises to one-family dwellings on plots of not less than five acres. This agreement, by its terms, was to expire in 1948, but prior thereto, it was extended to August of 1958.
In 1953, one Leeston-Smith acquired the 73-acre parcel, burdened as it was with the 5-acre restriction, plus a 110-acre tract adjoining it on the north, as to which latter tract only the town’s 2-acre residential zoning restriction applied.
Leeston-Smith petitioned the Town Board to permit him to downzone the 110-acre parcel to one-acre plots rather than two. Concurrently, and as a sop to the signatories of the 1938 and 1948 agreements, he offered to execute and record a declaration limiting, in perpetuity, the 73-acre parcel to one-family dwellings on plots of not less than five acres each. The offer also included a clause that while the other property owner signatories would not themselves be bound by the five-acre restriction they were to be included as beneficiaries of the restrictions placed upon the 73-acre parcel. Once effectuated, the declaration could be can-celled at any time ‘ ‘ After the first day of August 1958 by the written agreement of the then owners of lands subject to and benefited by this agreement, whose total holdings subject hereto and benefited hereby at the time such cancellation agreement is made are assessed at not less than ninety per centum (90%) of the assessed value of all lands then subject to and benefited by this agreement.”
The signatories protested vigorously and fought for the status quo. The Town Board suggested that the adversaries confer with a view to reaching a mutually acceptable compromise.
No compromise was effected. Taking the initiative, the town then granted the Leeston-Smith application and accepted, as offered, the declaration affecting the 73 acres, which was dated July 28, 1953 and recorded six days later.
The vigorous dissenters did not acquiesce in the decision arrived at, but took no legal steps to test the town’s action. They resigned themselves to the situation in the thought that after 1958 they could fall back on the declaration for partial protection, and presumably could police themselves as to the larger holdings south and southwest of the subject 73 acres.
Having accomplished his purpose, Leeston-Smith disposed of both the 110 and the 73-acre plots to land developers and departed the scene.
Thereafter a subdivision map (Audubon Farms) was filed as to the 110 acres. The Town Planning Board further reduced the *1007 building requirements (Town Law, § 281) from one acre to 30,000 square feet to compensate for the introduction of the streets in the development; but retained the housing density at one per acre.
Within a relatively short time thereafter, interested parties, listed in the complaint as the defendants De Rosa, Parker, Sofarelli (now Millar), Miller and Strebel (now Reidell) purchased and improved five-acre parcels on the subject premises. They made their individual selections from a sketch entitled “Map, Partition of Property of Louis S. Lipshitz” dated March 3,1954.
The defendants Payne purchased two contiguous five-acre parcels but have not improved them to this day. In like manner the defendant Konowitz has permitted his land to lie vacant.
Henceforth the properties shall also be referred to as Audubon Farms and Lipshitz respectively.
At a point generally south of the Lipshitz tract lie the lands of those owners whose holdings are benefited but not restricted by the Leeston-Smith declaration. We shall call it the unrestricted area.
Two of the latter defected, at least in part, from the stand taken by their colleagues. One, the defendant Wayland, sold off 12 of his 18 acres for four three-acre plots and then disposed of the other six in bulk to a nondefendant. The defendants G-wynne disposed of a considerably larger portion abutting the south side of Chichester Road directly across from defendants Parker, Sofarelli (Millar), Miller and Strebel (Reidell). The property now comprises the High Hills development (Map 2963, filed May 18, 1959) and two individual homes adjacent thereto, all located on plots of more than two but considerably less than five acres each.
To the northwest of and about 700 feet from the Lipshitz map, Chanticleer Farms development was established on a map with 23 building plots. Originally the northwestern portion of this map provided for 24 50x100 foot lots and the southeastern part for two, or more than two acres each. The town authorities reduced this to 23 building lots by increasing the smaller ones to 100 feet by 100 feet and decreasing the larger to 100 feet by 200 feet. This served to lower the housing density formerly allowed even though it lessened the square footage of the Chanticleer lots nearer to the 73-acre parcel.
To the south and west of Lipshitz and in the unrestricted area, but not physically contiguous to the affected parcel is that portion of the former Stimson property which was sold to the Boy Scouts of America in 1958 for a camp site. No buildings have *1008 been erected there since the sale; and whether any are contemplated is not currently known to any of the litigants or to the court.
So the facts and the geography stand at the moment. We turn now to the pleadings.
The action was started in 1956, prior to any physical construction on Audubon Farms to the north; on High Hills map to the south; to the Wayland property on the southwest; or to Chanticleer Farms, one eighth of a mile to the west.
At the time of its inception the public records disclosed for all to see that the 73 acres were restricted as noted; and that except as changed in the Audubon Farms’ case (110-acre tract) all properties contiguous to Lipshitz were in an “ A ” residence zone (two-acre minimum).
Motions and countermotions were resorted to by the contending parties, the net result of which was to reduce the complaint from three causes of action to one.
The gravamen of the complaint which now seeks to sweep away the restrictions appears in paragraphs 1113 ” and “ 14 ” of the complaint. They read:
‘113. That since the making of the said restrictive agreements, great, impressive, unexpected, radical and permanent changes, not under the control of the plaintiff, have occurred in the character of the locality of the properties affected by the restrictions contained in the aforesaid agreements, and in the class, character and use of real property in the neighborhood and vicinity of the real property owned by the parties herein.
“ 14. That the changes in the vicinity of the properties restricted by the aforesaid agreements have been so extensive that the changes could not have been visualized when the covenants sought to be cancelled, as hereinafter prayed for, were made. ’ ’
In addition to a general denial the several defendants interposed five affirmative defenses, the over-all tenor of which is that the elimination of the restrictions will result in a depreciation of property values and the loss of the benefits which accrued to them by the Leeston-Smith declaration.
When the case came on for trial, the court called to the attention of counsel that the Town of Huntington was not named as a party nor had it requested permission to appear as intervenor or amicus curice. Invoking its power under subdivision 2 of section 501 of the Beal Property Law, the court invited its participation.
The Town Attorney then appeared and stipulated that the taking of testimony might go forward without his physical *1009 presence so long as the town was given leave to come in at a designated future date as intervenor or amicus curia; and, through its attorney, to recall and examine witnesses and/or submit a memorandum of fact and law.
Since then, the town has entered the case as intervenor and has filed a brief aligning itself squarely on the side of the answering defendants. Of this more anon.
In testimony taken at the trial before the court after a jury waiver, the president of Longdowd stated that he was personally familiar with the terms of the Leeston-Smith declaration at the time of plaintiff’s purchase as well as constructively aware of it by reason of its existence as a public record. His implication was that it was a mere scrap of paper. In effect he would have “ the treaty broken ere the ink wherewith ‘ twas writ, could dry ’ ’ ’ and solicits the assistance of the court for the purpose.
He added that two persons associated with Longdowd (Reilly and Pennino) had each bought and built on five-acre parcels within the plaintiff’s holdings and had orally agreed to reconvey three acres each if and when plaintiff succeeds in the suit at bar.
In support of Longdowd’s case, three persons named as defendants owners of parcels in the 73-acre tract (Parker and Payne and wife) who were joined by Millar and wife (successors in interest to defendants Sofarelli) testified in favor of eliminating the allegedly onerous and oppressive covenant.
At the same time, other defendants both within the restricted and unrestricted areas, stoutly maintained their opposition to the removal of the subject covenant; and plaintiff malíes no claim that owners of 90% of the assessed value of the properties of the affected parties acquiesce in its view.
Two real estate appraisers, one called by each side, opined that a reduction from five to two acres would enhance the money value of the properties within the 73-acre parcel — and the court credits their testimony. Thus, if this were the sole criterion for judgment the plaintiff would necessarily prevail.
However, other criteria are to be considered. We find them in the 13th and 14th allegations of the complaint (supra), wherein Longdowd speaks of the “ great, impressive, unexpected, radical and permanent changes not under the control of the plaintiff,” which have occurred and the extensiveness of them, which could not have been visualized when the covenant was made in 1953. We find them also in the answer wherein the affirmative claim is made that to remove or emasculate the covenant would deprive the defendants of the benefits accruing from the Smith declaration.
*1010 Let us examine these claims.
Beginning to the north we must eliminate Audubon Farms. That 110-acre tract was considered as part and parcel of the Leeston-Smith declaration; and whatever was done there was to be expected. For judicial approval of such a course see Church v. Town of Islip (8 N Y 2d 254, 259). To the east on Sweet Hollow Road the facts show that in August of 1953, only the town’s two-acre restriction controlled; and that no changes have been effected.
Only to the south and to the southwest could anyone seriously maintain that sweeping changes have occurred. There the High Hills development has been created and Wayland has sold off his property. To the west nothing has happened which was not within normal expectation.
To get a first-hand view of the topography, the court physically inspected the area on July 17, 1963, in the daytime. This was done pursuant to the consent given in open court by the respective counsel.
The inspection revealed that the three highways, which serve as the east, south and west perimeters of the 73 acres, are incredibly narrow and winding, and are actually or potentially dangerous as thoroughfares on which to operate motor vehicles.
Chichester and Hartman Hills Roads are well-surfaced macadam highways, while Sweet Hollow Road is dirt-topped for the full eastern length of the property at issue.
• Trees, foliage, shrubs and undergrowth come down to the very edge of the roads. There are no shoulders to the highways. Two conventional size cars have to exercise caution in passing, and a careful driver should blow his horn constantly to apprise other operators of his approach.
Presumably a complete metamorphosis would have to take place if the restriction was lifted.
The entire immediate neighborhood of the subject parcel and the unrestricted area appear as virgin territory. There are no signs of human habitation along the three roads save an occasional mailbox, and except at the entrances to the various improved properties when one may get a glimpse of the buildings.
In its brief, plaintiff derides the claim of the unrestricted defendants that their privacy will he jeopardized by reducing homesites from 225,000 to 90,000 square feet; and suggests that they must be exquisitely attuned to the needs of privacy to be able to tell the difference. The defendants reply that they are the best judges of the privacy they think needful. As the poet says: “ There is society where none intrudes ”, and it *1011 is the circumstance of the relative scarcity of people in the neighborhood and its unspoiled, forestlike aspect which these defendants desire to maintain.
Plaintiff argues, too, that the restriction is already outmoded and invites the court’s attention to section 346 of the Real Property Law for support. Subdivision 1 of that section reads in pertinent part that “1. No restriction on the use of land created at any time by covenant, promise or negative easement * * *' shall be enforced by injunction or judgment compelling a conveyance of the land burdened by the restriction or an interest therein, nor shall such restriction be declared or determined to be enforceable, if, at the time the enforceability of the restriction is brought in question, it appears that the restriction is of no actual and substantial benefit to the persons seeking its enforcement ”. And subdivision 2 further states (in part): “ 2. When relief against such a restriction is sought in an action to quiet title * * * if the court shall find that the restriction is of no actual and substantial benefit to the persons seeking its enforcement * * * either because the purpose of the restriction has already been accomplished or, by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or for any other reason, it may adjudge that the restriction is not enforceable by injunction * * * and that it shall be completely extinguished upon payment, to the person or persons who would otherwise be entitled to enforce it in the event of a breach at the time of the action, of such damages, if any, as such person or persons will sustain from the extinguishment of the restriction ’ ’.
In practical effect this section is merely a statutory enactment of the course often followed over the years by courts of equity. Plaintiff, however, begs the question in stating that the restriction is nonactual and nonsubstantial.
It is certainly actual and substantial enough to have warranted the action of the town in accepting it as a covenant running with the land in perpetuity (subject to cancellation as heretofore noted) and to insist upon its retention. Its actuality and substance are attested to, also, by the vigorous manner in which the beneficiaries insist upon its continuance.
But, says the plaintiff, the town has no business in this case. This is no zoning matter. It is an article 15 of the Real Property Law action. So it is. Still, if the court were to find for the plaintiff, the effect would be to change the town zoning with respect to the 73-acre parcel, because at the moment no one can obtain a building permit to erect a house thereon on less than five acres.
*1012 A close scrutiny of the case indicates that the proper step for plaintiff to have taken would have been to ask the town for a change of zone, and upon refusal, to seek relief in this tribunal by way of an action for a declaratory judgment. Instead ‘‘ Longdowd ’ ’ seeks to come in through the back door and to strike at the ordinance in an oblique fashion. Because, however, of the importance of the issue, the court has disregarded any question of jurisdiction and has considered the case solely on the merits (Thomas v. Town of Bedford, 29 Misc 2d 861, 870, affd. 15 A D 2d 573).
In Korn v. Campbell (192 N. Y. 490 [1908]) our highest court considered the various types of restrictive covenants. It enumerated three, the first and third of which, taken together, appear to be applicable to and analogous with the case at bar.
Wbeubb, J., writing for an unanimous court, said (pp. 49A-495): “ There has been much judicial writing upon the subject of restrictive covenants, and as may be anticipated from the very nature of the topic, the cases abound in fine and subtle distinctions which have been invented either to overcome the rigor of the common law in courts of equitable cognizance, or to adapt the settled forms of relief to fit special cases. There are many decisions upon this branch of the law which appear to be in hopeless conflict with each other, but which are easily reconcilable when their peculiar circumstances are understood * * * For the particular purposes of this case such covenants may be broadly divided into three classes. In the first class may be placed those which are entered into with the design to carry out a general scheme for the improvement or development of real property. This class embraces all the various plans, generally denominated in the English cases as building schemes, under which an owner of a large plot or tract of land divides it into building lots to be sold to different purchasers for separate occupancy, by deeds which contain uniform covenants restricting the use which the several grantees may make of their premises. In such cases the covenant is enforceable by any grantee as against any other upon the theory that there is a mutuality of covenant and consideration which binds each, and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of a lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract [citing cases].” And further (p. 496): “ Then there is a third class, where there are mutual covenants between *1013 owners of adjoining lands in which the restrictions placed upon each produce a corresponding benefit to the other, and in such a case, of course, either party or his assigns may invoke equitable aid to restrain a violation of the covenant. (Trustees of Columbia College v. Lynch, 70 N. Y. 440.) ”
Since that decision, the principle enunciated in Church v. Town of Islip (8 N Y 2d 254) namely that a town may impose conditions as a prerequisite to effecting a change of zone, has been given judicial sanction as against the charge that a legislative body may not zone by contract. This imposition of conditions is precisely what was done by Huntington when it lowered the Audubon Farms acreage requirements and accepted the Leeston-Smith declaration.
More recently, the Appellate Division, Second Department, in Congregation Khal Chasidim of Brooklyn v. Congregation Beth El of Borough Park (19 A D 2d 622) handed down a decision upon this subject which reads as follows: “ In an action under article 15 of the Real Property Law to cancel and discharge of record a covenant which, inter alia, restricted the use of plaintiff’s real property to two-family residences, the plaintiff appeals from a judgment of the Supreme Court, Kings County, entered May 9, 1962, after trial before a Special Referee, upon the decision of the Referee, dismissing the complaint on the merits. Judgment affirmed, without costs. Although the record supports plaintiff’s claim of substantial change in the character of the neighborhood, relief from the restrictive covenant will not be afforded, where, as here, the restrictions are of substantial value to the property to which the covenant appertains (Rowland v. Miller, 139 N. Y. 93; cf. Winston v. 524 West End Ave., 233 App. Div. 5; cf. Rouss v. Bardwil, 255 App. Div. 858, affd. 280 N. Y. 737).”
It may be that in the future conditions will so change in the immediate neighborhood as to constitute the “ great, impressive, unexpected, radical and permanent changes ” of which plaintiff speaks in its complaint; or it may chance that the owners of not less than 90% of the assessed valuation of the properties affected by the Leeston-Smith declaration will some day band together to effect its cancellation. At the moment, however, the court holds that the restriction is one of actuality and substance; that it does benefit and is meant to enure to the benefit of both the restricted and the unrestricted areas; and that it should remain in full force and effect. The complaint is, therefore, dismissed, without costs.